We will now hear the first case, United States v. Twiss. Mr. Egan. Thank you, Chief Judge Kassman. Good morning, and may it please the Court. Jason Twiss was ordered removed from his car as he sat in a parking lot at a hospital at approximately 2 a.m. He was ordered to lay on the ground and handcuffed behind his back and taken into a police car to be detained on the basis of a call in which two men, demanding anonymity, reported that somebody in the car possessed a gun. How do you distinguish this case, your case, from Navarrete v. California, where, as you know, the Supreme Court held that the police are justified in relying on an anonymous 911 call where the call is, one, made by an eyewitness, two, nearly contemporaneous with the event, and three, recorded and traced by the 9-11 system? So, a few things on that point. First of all, Navarrete concerned, as you say, a call contemporaneous with the event. In this case, it's not super clear that that was the case. You know, the police officers showed up within, one police officer showed up within a minute. The police were there very quick, no doubt about that. And if you listen to the call, it's clear these men are walking away from that scene. So how can you say that it was not contemporaneous? And in any event, didn't the district court determine that it was more or less contemporaneous with the event? I'm not sure that the court made an express finding on that. I don't know if that was a question for the court. Granted, they were walking away. They said where they were walking. They said where they were walking to. All this goes to whether there was reason for a Terry stop. I thought part of your argument was that what happened here went beyond an ordinary Terry stop because he was handcuffed, he was on the ground after they found nothing on, no gun on him, and then put him in the car. Are you arguing that this is a de facto arrest? Absolutely, Your Honor. That's the second point. My first point is that the call was both unreliable and failed to make out an ongoing criminal act. And then even if it did, the measures used by the police extended the Terry stop. I'm going to ask you something, which I will ask more of the government. And it's a bit odd. Don't our cases, in fact, not what we said, but in fact, have a relationship between the degree of probable cause, the degree of likelihood that something is going on, and how intensive the Terry stop almost arrest is. That is, that where we have very little information, we've held it enough, we're basically one stopped and just asked a few questions. But where instead the result of a Terry stop amounted almost to an arrest, even if it didn't, we've required much more connection in order to uphold it. Now, I know the cases don't say that, but I wonder whether that isn't what they do. I agree that that's what they indicate, if not expressly state. Obviously, if they did have probable cause, the police could have done exactly what they did. Yeah, if they had probable cause, they could have arrested. Right. And so if you go back to Terry, you look at Terry and sort of antiquated notion of a kind of exchange, verbal exchange, and then a kind of almost pleasant pat down. I don't mean to be flip. But and then now we have where it's reasonable suspicion plus sort of danger, where the subject of the stop is said to be both armed and dangerous. Then courts do sort of expand the measures courts can take in relation to not just the basis of the reasonable suspicion, but characteristics about the person that's being stopped. And here what we had was a call about two men and a woman near a hospital with an AK-47 and a gun. Is that right? That's correct. Yeah. But in there, Your Honor. Why in that circumstance is it reasonable suspicion given that the occupants of the vehicle were said to be armed? So I think a couple of reasons. Just getting past the 911 call for a moment, just looking at the basis of knowledge in this case. If it's just you're looking at the raw data, two men and a woman have an AK-47-like gun and a pistol, that's one thing. But then when you add how they came to know that and they say that it was shown to them, not displayed, but shown to them while either all of them were in the car or one of the men was urinating and we're not sure where the gun was seen. Was it on the person's body? Was he carrying it? Was it in the car? None of that was elaborated on, though the dispatcher questioned the two men about how they came to know what they claimed to have seen. I see what you're saying, but help me understand. What's the best case that you can make that a report of individuals displaying guns to strangers in a parking lot at 2 a.m. does not provide officers with reasonable suspicion that the firearms might be used to avoid arrest? I think the men claimed anonymity. They wanted the officers to exercise discretion to question them and not question them about the guns, indicating that the men were not dangerous, that the police were free to go and question them discreetly, as in the words of the caller. In that case, I think the officers were on notice that these men were not dangerous. So if you listen to the call, the second caller says, I want to remain anonymous. In effect, he doesn't use quite these words, but I think it's a reasonable inference to draw from what he says. In fact, I'm afraid. I'm afraid of them. He's afraid if they go and ask them for the guns that the subject of their call will retaliate for them calling the police. Fear of the subject of the call? Fear for having the police involved and being stopped and interrogated and the rest that comes with the Terry stop in this case. Not necessarily that they were afraid of the men absent the police involvement. So I think that's an important distinction. The dispatcher could have asked a lot of questions and the police could have done a lot more investigation. They didn't even run the license plate, for example, of the truck before forcing the men out and handcuffing them. The dispatcher could have questioned them further about how they came to know what they were doing, who they were, where they were going, what happened at the scene, who said what, where the guns were exactly. They say they had two guns. They only say they were shown one. All of these indicate that additional investigation was necessary before conducting this de facto arrest. Thank you. Thank you. May it please the court. Pull the microphone down, thank you. I'm glad I'm not playing basketball with Mr. Egan. Nor I. Thank you, Your Honor. I think it's without question that there was reasonable suspicion established by the anonymous phone call in light of the factors that are identified in Navarrette. Why is it suspicion after Heller when we get told that somebody has a gun? Now, you know, I don't like Heller very much, but now people have right to have guns. So why is it, some other circuits, we haven't, but why after Heller when somebody says somebody has a gun, is that a statement suspicion of a crime? I would say this, Your Honor, and if you'll forgive me, this is not tethered to the case law. This is a personal opinion. It seems to me that when there's reasonable suspicion, we don't know if a crime has been committed or not. So when an officer sees anyone with a gun, there is reasonable suspicion to believe that it might be, that it's possible. It's possible, but if it is a constitutional right to have a gun, how can an officer have reasonable suspicion? I mean, it's like saying somebody makes a statement and an officer has a reasonable suspicion that that might be more than free speech. I mean, you know, the Supreme Court has told us things about the Second Amendment. And as I say, I don't like it, but that ain't for me to say. Well, I mean, we know that the fact that the circumstances presented to the police might constitute innocent behavior does not defeat reasonable suspicion. Is there a Second Amendment right? And then is there a prohibition in New York State, so somewhat two different questions, to carry an AK-47? The way I understand the law, first of all, is that the statutes that were referenced below from New York State prohibit the carrying of a loaded AK-47. I suspect there are exceptions in the statute, maybe at a sporting event, maybe at a hunting, but apparently not under these circumstances. What did they say? Did they say these people had a loaded AK-47, or did they just say these people had some guns? They said these people had what looked like an AK-47 and a pistol. So maybe there isn't probable cause to believe the gun is loaded, Your Honor. But there is certainly... So we got some problem because of that. Now comes what they actually did. Did they do a simple little Terry stop, or did they de facto arrest or come darn close? And again, I'm asking the question, don't we have to have... I mean, if you go back to Terry, Terry says you cannot stop somebody unless you have some indication of something wrong. And then you do a little bit of something. Here you have something which I might feel is a very serious indication of a crime, but after Heller is possibly a crime is being committed. No more than that after Heller. And then if they don't arrest him, they come darn close. I mean, they don't find a gun on him. They still handcuff him on the ground. They put him in the car when they still haven't found a gun. Now, why isn't that combination something that given the attitude the Supreme Court has towards guns, something that ought to worry us? Well, because you have to put it in context of the totality of the circumstances. It's not just someone saying this other person has a gun. It's 2 o'clock in the morning. It's a parking lot of a hospital. The allegation is that the guns were displayed to the callers. Enough to make them take off, although conceitedly they say they were not threatened. A startling event. Why a reasonable police officer, I think, would say what was going on at 2 o'clock in the morning with these two types of weapons in a parking lot? When you say a reasonable police officer, we're not dealing with a suit against the police officer where qualified immunity is there. That's a different issue. The question, you know, I might well agree with you that a reasonable police officer might be immune from suit in this situation. That isn't the situation. You shouldn't confuse those two types of cases. I beg your pardon, Your Honor. I don't mean to. But aside from having a loaded weapon, which was one of the crimes that the officer testified he was suspicious of, we also have the crime of menacing. And menacing involves the display of what appears to be a firearm that puts a person in fear of harm. I'm paraphrasing. But you told us that they didn't manifest menace. I mean, that they didn't say. If they had said these people took guns out and scared us and, you know. Well, they essentially said that. They didn't say scared us. They said we were confronted, the firearms were displayed, and we took off. Now, is that enough to create a reasonable suspicion in an officer that a crime might have been committed under these circumstances? I think there's no question but the answer to that. And on that basis, you say there is enough to take somebody and handcuff them on the ground after they have no gun in them and put them in a car so that, as a practical matter, these people cannot possibly leave. And this is just a Terry stop of the trivial sort that Terry originally allowed. Well, I wouldn't characterize it as trivial, Your Honor. And at the risk of going awry, I would say a reasonable police officer would take those measures at 2 o'clock in the morning, faced with a truck with three occupants that he doesn't know, with the likely presence of two firearms, and the need to protect himself and everybody else. I've got to say that this type of case is an example of how the exclusionary rule, because we always are dealing with people who have been found to have been doing something illegal, has pressed the law in a direction where if we didn't exclude this evidence, we would never say that this was okay. The exclusionary rule is having exactly the opposite effect of what people thought it would do. I suspect, Your Honor, that you say that because there's a view of this conduct that could be viewed as extraordinary. But that's not what the exclusionary rule was intended to remedy. If there was a Fourth Amendment violation here, the exclusionary rule was not intended to remedy this defendant's Fourth Amendment rights. It's to deter police conduct in the future. And while we can disagree about the—I think we're talking about the scope of the stop, not whether there was reasonable suspicion. I'm making that assumption. How long was Mr. Twist detained? That is, when the police officers arrived, how long was he—was he put in handcuffs? He was put in handcuffs when he was removed from the car, yes. How long was he detained before they found the loaded firearms? I apologize for not knowing the exact amount of time, but I recall that— Not very long. It was about five minutes total before the firearm was found and found to be loaded. It was a minute from the call for the officer to show up. The other officers arrived within seconds, according to Officer Charest. They immediately began commanding the occupants of the car to come out. Each one of those incidents, it struck me, Officer Charest said, we were moving very slowly. It took about a minute apiece. And then once they had everybody out of the car, they opened the door to see if anyone else— Mr. Silver, you mentioned menacing, and it is true that one of the callers—because there are two callers, right? Yes. One of the callers says they weren't threatening, but I think it's the same caller who says he, that is, his friend, we just got out of there because my buddy's afraid. Yes. Judge Sharp found that the two callers were not threatened, but he did talk about the fact that they were confronted, and he did conclude, the court concluded, that it was a startling event. If they weren't threatened, how could there be menacing? Well, if the gun is displayed and it places them in fear, that's sufficient. You're hanging your head on that line. I am not. I think it's a mistake in analysis to say here is a specific crime that the police were investigating. I think it's enough to say that under all of the circumstances present, the police had a reasonable suspicion that criminal activity might be afoot. Maybe it's to rob drugs out of the hospital. I don't know. I don't think we should cabin what the police are looking for when they initiate the Terry stop. It's enough to say that this is suspicious, and it might be criminal activity. On the question of whether— That's a very, very broad statement. Just how far does that go? And compare. It's sort of interesting to go back and read Terry and see how far we've come. I was giving you a hook to hang your hat on, but okay. I don't want you to say I didn't disclose something the next time I see you. No, it's true. It's sort of funny because Judge Sharp on that didn't find menacing, could have, and then it would make it much easier. And found instead that the gun would have been found anyway, which is much harder to go along with. It would have been much easier if the district judge had found the opposite of those two things. On the inevitable discovery of the rifle issue, I'm a bit puzzled. You've got the district court gave way to Officer Saraceno's testimony that he walked up to the vehicle. He would have been able to view the rifle had he walked up, even if the door was closed and the window was set up. But then you've got Officer Charest's testimony, and you talked about Officer Charest's testimony. And he says that because the windows were heavily tinted, they had to open the doors to determine whether anyone was inside. Isn't there some tension between those two views? There might be some, but I don't think Officer Charest said he had to open the door to determine if anyone was inside. I think he opened the door to make sure somebody wasn't in the car, and I think that was a reasonable step. Where I thought you were going to- Because the windows in the truck were so tinted, didn't he say that? I don't believe so. Officer Charest said when he arrived, he could not see if anyone was in the truck. He was behind the truck. Officer, I'm going to say Selenia, I don't know if I'm pronouncing his name correctly, also was behind the truck. And he also said he couldn't see into the truck. The two officers that described their position as perpendicular to the truck, which I interpret to mean on the sides, both said from both sides of the car that they could see the occupants in the car. One said specifically three occupants. I believe that was Officer Aitken. And Officer Sarastino said he could see people inside, and I believe he even said hand movements. Depending on your position compared to the car, you might see or you might not see through the tinted windows. From behind the truck, you would not see it according to the officers. Both officers who were on the sides said they could see inside. So may I ask a follow-up question about the de facto arrest argument? Would you agree that at a certain point, and I understand that the techniques that they used were in accordance with the protocol, is that correct? Yes. Would you agree that at a certain point, regardless of whether the police officers abided by this protocol, it could have become, before they found the loaded firearms, an arrest? Yes. At what point is that? Well, I'm not sure at what point, given the fact that the concern here was 2 in the morning and the presence of guns. I did have a thought on the train coming down, Your Honor, which is not in my brief. But I do recall in this court's decision in Bailey, it was at a point where the person being questioned in a Terry stop was handcuffed, that the court found it turned into an arrest. So that's not in my brief, but it struck me. Now, in Bailey, the circumstances were not that the questioning officers were faced with the possibility that there's a gun in the car, which is, Judge Caldres, you indicated earlier, there might be a sliding scale, depending upon the nature of the threat that the officers faced. Well, they found he didn't have any gun on him. And at that point, he is handcuffed and put in the police car. Does that amount in those circumstances to a de facto arrest? Where is it that we say, this fellow clearly didn't think he could just get up and leave? I mean, reasonably, if you're handcuffed and put in a car, you don't think you could leave. Even without the handcuffs, he would not have thought himself free. Yeah, but the handcuffs make it a bit more dramatic. And I've never seen it listed as a factor, but I note that when Officer Charest put Twiss in handcuffs, he told him, you're not under arrest. Yeah. But my point being that when we get to the Herring argument, Officer Charest did not intend to effect an arrest when he only had reasonable suspicion. Is intent of the police the matter? Yes. Or is it objectively what has happened? I think intent is a factor. I don't deny that. I just wonder whether that is a factor together with what the person believes is going on. I'm way over my time. I would like to make one point with respect to the nature of the measures taken. And that is my Hudson versus Michigan argument that if the police had not acted so extraordinarily, for lack of a better word, if they had toned down their response, they still would have found the gun. The tactics employed did not result in this. So you can do anything is what you're saying. I'm saying that the Supreme Court has said in applying the exclusionary rule, where the deprivation of the Fourth Amendment right occurred has to result in the evidence that sought to be excluded. I wouldn't say you have the right to do anything. So ultimately you're relying on this inevitable discovery rule. This is your last argument. The inevitable discovery should be my last argument, but I think the Hudson versus Michigan argument is— Your argument is a different inevitable discovery. You're saying that even if they had just left him without handcuffs and had talked about the weather with him during that time, and during that time had opened the car door and had seen the gun, they would have found the gun. Yes. And that if that had happened, then the suspicion was enough for that kind of lighthearted conversation and the gun would have been found. That's very different from saying we would see the gun directly. We've argued both. I apologize for taking the time. No, we've taken your time. Thank you. Thank you. Mr. Regan. I'd just like to point out a couple of things. I guess first, Chief Judge Katzmann, on your question about the inevitable discovery, and you referenced Officer Saraceno's testimony about seeing in through the window. I'd just point out that that testimony—the question that elicited that testimony was simply, would you have been able to see through the window if it were rolled up? And he said yes. He wasn't asked and he never said whether he would be able to see the gun had twists remained in the car. So that's an important point, I think. I think just to end—well, let me just touch on Hudson quickly. I think Your Honor understands my point, but if the de facto arrest— if we were questioning whether something was a de facto arrest, that would be pointless questioning if it never led to suppression. And then on menacing, it's not raised in the brief because it wasn't touched below by the district court, but it gets into whether Terry can be used for past crimes, which is a Hensley Supreme Court case. There they said it can be used for past felonies. Menacing, as I think the government understands in this case, would be a misdemeanor. And I think if you look carefully at the recorded call, the transcript, and both listen to the audio, when they talk about taking off and being afraid, it's really in response. They took off because they were cutting through the parking lot, according to them, anyway, so they took off after it happened. They just walked away. And their fear was more, as I said in my opening, about retaliation after the police became involved. Could you address this Hudson argument that was made at the very end? Yes. The notion that somehow it would be okay if they had done what I'll call a genuine, in the sense of old-fashioned Terry stuff, just a few conversations, and during that time looked in the car and found the gun. But the fact that they did more shouldn't lead to an exclusionary. Right. I guess I don't know exactly how that would have played out, the hypothetical sort of old-fashioned Terry stop. Who would have been taken out of the car? Which officers would have been near the car? Where would the officer have been located in relation to the gun and all of those sorts of questions? But I think it really, I don't know that that's an important point. I mean, I think Hudson's talking about the knock and announce rule, which is sort of, and Justice Scalia's terminology is really not important. It's not keeping your house safe from police and government intrusion. Here, the reason we talk about the fact of the arrest is because we don't want police to engage in more intrusive detentions than necessary. So I think that that's the reason, the whole but-for sort of causes, I don't know. What do we make of the fact that the officers here, according to the district court, I believe, seem to have comported with or abided by this protocol established by the police department? Well, I don't know exactly what the protocol is in sort of written terms. As I understood it, how it was presented below, it's any time a firearm is sort of claimed to be involved in a police encounter. There's no challenge that they complied with the protocol in connection with this encounter? I don't know, but my – well, yeah, but I think – I understand. I think the protocol – this would be a reason for suppression because the protocol is – would change police conduct. Wouldn't your argument on that be the protocol would protect the police from any suit that was made against them because they were behaving, but if the protocol itself is a protocol that goes beyond what is appropriate, then it becomes all the more reason for saying that that. I'll take that. Isn't that a – isn't it a factor in determining whether there's an inappropriate de facto arrest after – Well, I don't think so. I think if it's a factor at all, maybe it's in the last step of the analysis as to exclusionary rule and the level of whether this was intentional, reckless, or grossly negligent. I would argue that it is because you can't have a blanket policy that covers every potential encounter with police involving a claimed gun. The protocol, if it were clear, just hypothetically, the protocol was established and was widely used by police departments around the country in connection with legitimate police safety. So there's a call about a gun, and this is the protocol you use in connection with – or a gun, an AK-40, whatever it is, say a loaded firearm. Right. Then how do we assess when the use of a protocol becomes a de facto arrest? I mean, I think your Honor – If police officers are going to use the protocol, what do we tell police officers? I think this is the problem of the Terry Stop, and we don't have bright line rules. So we can't have a policy, and the courts can't sanction that policy that says in any case in which a firearm is legitimately said to be potentially an issue, you can do a de facto arrest because then you're abandoning the very essence of the Terry Stop, which is an individual assessment based on the particular factors of each case. So that's my response. Thank you. Okay, thank you. Thank you both. Yeah, well argued by both sides. Thank you, Your Honor. Thank you.